# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

| | |
|---|---|
| THE ESTATE OF CANDACE H. SEAMAN, by Paul Seaman, Executor, <br><br> Plaintiff, <br><br> vs. <br><br> HACKER HAULING and W. M. HARRINGTON, <br><br> Defendants. | No. C10-4094-MWB <br><br> **ORDER** |

_____

This matter is before the Court on the defendants' motion for sanctions. Doc. No. 19. The plaintiff resisted the motion (Doc. No. 22), and the defendants filed a reply (Doc. No. 23). The Court heard telephonic oral arguments on the motion on October 7, 2011. During the telephone conference, the parties were offered an opportunity to present evidence at an in-court hearing, but declined. The motion now is fully submitted.

## BACKGROUND

On the morning of January 25, 2010, Candace Seaman was driving southbound on Interstate 29 in Monona County, Iowa, in her Chrysler Cirrus. Blizzard-like weather conditions, including high winds and blowing snow together with drifts and snow-packed pavement, made traveling on the highway treacherous, so Seaman pulled over to the right shoulder. Saber Amin was following Seaman in a Chevrolet Geo Tracker, and he pulled over behind Seaman. Later, Seaman pulled back onto the highway, and Amin followed suit. The two vehicles collided and spun out of control.

Defendant Wade Harrington was traveling southbound on Interstate 29 in a Volvo semi tractor-trailer owned by defendant Hacker Hauling. He came upon the spinning

vehicles and struck the rear end of Seaman's vehicle. Amin and Harrington were not hurt in the collision, but Seaman was seriously injured and died the next day.

Because of the poor highway conditions and inclement weather, the Iowa State Patrol was unable to make any measurements or conduct a detailed site or vehicle inspection. Patrol officers had the wreckage of the Seaman vehicle towed to Schroder's Services, Inc., in Onawa, Iowa, where it was placed in storage.

The defendants' insurer, Western National Insurance Company ("Western National"), was notified of these events on the day of the accident and immediately assigned a claim representative, Katie Scanlan, to the file. On February 2, a week after the accident, Western National received a letter from attorney John Gray stating that his law firm had been retained to represent the Seaman estate and Seaman's husband, Paul Seaman. Gray requested that the semi tractor not be repaired and that the semi's "black box" be retained. Scanlan called Gray the following day, February 3, and advised him that repairs to the semi tractor had been suspended. She also told him that Western National would be assigning an appraiser to look at Seaman's Chrysler and take some photographs, and that the appraiser would be contacting him to find out where the vehicle was being stored. On February 3, Gray also retained Jeffrey Peterson, an engineer specializing in accident reconstruction, "to reconstruct the accident to determine the speed of the Harrington Volvo semi tractor and trailer at the time of the crash." Doc. No. 19-2 at 52. About the same time, Western National hired forensic collision analyst Roger Burgmeier to investigate the accident on its behalf.

On February 11, Scanlan and Gray agreed that Burgmeier would download the semi's black box/electronic control module ("ECM") without Peterson being present, with the understanding that Western National would share the results of the download with Peterson when Western National received them. In Scanlan's notes, she wrote that she expected Burgmeier to inspect the Seaman vehicle as early as February 12. Doc. No. 22-2

at 34. That did not happen. On February 12, Burgmeier photographed the Harrington semi tractor and downloaded its ECM, but did not inspect the Seaman vehicle.

On February 24, Gray called Scanlan to make arrangements for Peterson to inspect and photograph the semi tractor. During the conversation, Scanlan informed Gray that an "independent appraiser" would be contacting him to make arrangements to see the Seaman vehicle. On March 2, the appraiser went to the Schroder Services storage lot and photographed the Seaman vehicle. Western National obviously knew where the vehicle was being stored, but did not notify Gray in advance that the Seaman vehicle was being photographed that day. On March 4, Peterson, plaintiff's expert, inspected both the Seaman vehicle and the semi tractor. Western National was not notified in advance that Peterson was inspecting the Seaman vehicle that day.

On March 12, Gray called Scanlan and informed her that Peterson had completed his inspection of the semi tractor and that it could be repaired. Gray inquired about the download results from the semi tractor's ECM and was told that Western National had not yet received them. Gray did not tell Scanlan that a few days earlier a Highway Patrol officer had called his office and advised him that the Patrol no longer needed to have the Seaman vehicle stored (Doc. No. 19-2 at 32-33; Doc. No. 22-2 at 46), or that the day before the March 12 telephone call his office had negotiated the transfer of the Seaman vehicle to Schroder Services in exchange for storage fees (Doc. No. 22-2 at 46). On the other hand, Scanlan did not tell Gray that Western National wanted to have an expert inspect the wreckage of Seaman's Chrysler.

On March 19, a week after Gray's call to Scanlan, and 53 days after the accident, Paul Seaman transferred title to the Seaman vehicle to Schroder Services to satisfy a $1,325 claim for storage fees. Doc. No. 22-2 at 47. The Seaman vehicle then was crushed for scrap. The data from the ECM in the Seaman vehicle was not downloaded or

3

otherwise preserved. Western National was not notified in advance that title to the vehicle was being transferred to a third party or that the vehicle was going to be crushed.

On March 25, Scanlan contacted Burgmeier and asked him to travel to Iowa to inspect the Seaman wreckage. On March 31, before Burgmeier took any action on this request, Gray wrote a letter to Scanlan asking about the results of the download, which he had not yet received.[1] At the end of the letter, he stated the following:

> [T]he towing charge bill from Schroder Services Inc. is enclosed. Our firm made the payment, but we will be looking to add this to the list of damages. The Schroder Services also alleged a storage fee of $1,325; this was satisfied by allowing Schroeder to salvage the 2000 Chrysler Cirrus LXI.

Doc. No. 22-2 at 48. It is likely that the Seaman vehicle was crushed before Gray wrote this letter.[2] On May 6, 2010, 101 days after the accident, Burgmeier contacted Gray to arrange for an inspection of the Seaman vehicle. Doc. No. 22-2 at 52. Gray advised Burgmeier that the vehicle had been sold and scrapped. On September 1, Gray, on behalf of the Seaman estate, sent a letter to Western National demanding compensation for damages arising out of the accident in the amount of $1,381,161.30. Doc. No. 19-2 at 44-50.

On September 8, Burgmeier notified Scanlan by letter that he had completed his review of the facts surrounding the collision. Doc. No. 22-2 at 35-36. He stated that the plaintiff's failure to preserve the "critical evidence" of the salvage remains of the Seaman vehicle "effectively eliminate[d] the opportunity to precisely evaluate the impact speed of the Volvo truck." Nevertheless, Burgmeier opined "with absolute certainty" that

---

[1]The results were received by Western National later, and on April 8, 2010, they were sent to Gray.

[2]A representative of Schroder Services later told Burgmeier's assistant that the vehicle was crushed "in early March," because "all of their cars were crushed then." Doc. No. 22-2 at 35. The accuracy of this statement is suspect, however, because the title to the Seaman vehicle was not given to Schroder Services until March 19.

4

Seaman's and Amin's driving conduct before the collision "directly contributed to the cause of this collision. The failure of these drivers to maintain a proper lookout and maintain proper control of their vehicles created a roadway hazard which, through no fault of his own, Wade Harrington simply had insufficient time/distance to avoid."

On October 15, 2010, the Seaman estate brought this action. On March 22, 2011, the plaintiff's expert, Peterson, issued a report in which he opined that, at the time of the crash, the closing speed between the front of the semi tractor and the rear of the Seaman Chrysler was 53 to 63 miles per hour. Doc. No. 19-2 at 56. He based the opinions he expressed in his report in part on his inspection of the Seaman vehicle at Schroder Services on March 4, 2010. *Id*. at 52, 55.

On May 31, 2011, Burgmeier completed his report on the collision. He stated that, "[w]ith the exception of the 2005 Volvo semi-tractor, none of the collision involved vehicles were preserved for forensic inspection. I was initially advised the 2000 Chrysler Cirrus would be preserved for subsequent inspection, but it was destroyed before I was allowed access to the vehicle. As a result, I was denied the opportunity to inspect, evaluate and examine this critical piece of evidence." Doc. No. 19-2 at 61. Because of this lack of physical evidence, Burgmeier did not address the approach or impact speeds of the vehicles. *Id.* at 62. Burgmeier ultimately opined that the collision was "unavoidable" in light of the semi tractor's braking characteristics, the roadway hazards confronting the semi's driver, and the lack of a viable escape route. *Id.*

On June 3, 2011, Ted Sokol, an accident reconstruction expert retained by the defendants, completed a report in which he stated the following:

> Since at the time of the speed analysis the 2000 Chrysler Cirrus was not available it was necessary in the analysis to utilize the limited measurements made by [Jeffrey Peterson]. In his report, [Peterson] made no mention of any observations he made during the inspection of the Chrysler Cirrus as far as paint transfers, or damage evaluation that would have assisted in the reconstruction of the sequence of collisions. In addition, during his

5

> inspection of the accident site on March 4, 2010, no mention or documentation of any gouge marks on the roadway were indicated which would have assisted in the determination of where the collision(s) took place. [Peterson] also failed to utilize the accident scene photos to locate the at rest positions of the vehicles. The Chrysler Cirrus and the trees along the west fence line are now no longer available. As a result, a more detailed inspection of the Chrysler Cirrus and the determination of the at rest position of the Harrington truck, utilizing the trees along the west fence line, is no longer possible.

Doc. No. 19-2 at 66. Nevertheless, Sokol opined that (1) the collision between the semi and the Seaman vehicle was at least 278 feet north of the at rest position of the Seaman vehicle, and (2) the semi's driver was traveling at an approximate speed of 52.5 miles per hour when he collided with the Seaman vehicle. *Id.* at 66, 68.

## DISCUSSION

The defendants assert that the Seaman vehicle was destroyed before their experts had a reasonable opportunity to inspect it. As a result, their experts were unable to take their own measurements of the vehicle or observe the scrapes, scratches, marks, paint transfers, and other evidence that could only be seen in a careful inspection of the wreckage. They also were not able to observe or measure the deformation of the structural components or the underside of the vehicle or download the data in the vehicle's ECM. They claim that, as a result, their experts could not determine the approach and/or impact speeds of the vehicles, and had difficulty reconstructing the accident. They point out that Peterson, the plaintiff's expert, was able to use information he obtained from his own inspection of the Seaman vehicle to calculate the closing speed between the semi and the Seaman vehicle, something they were unable to do.

In the defendants' motion for sanctions, they seek the exclusion of "any evidence at the time of trial that is derived from an examination of the Seaman wreckage," including "any testimony from Plaintiff's forensic engineer, Jeffrey Peterson, and his work product."

6

Doc. 19-1 at 14. They argue that "the party and/or his attorney responsible for the disposition [of the Seaman vehicle] knew, or should have known, that the evidence would be relevant to potential litigation." *Id.* at 9 (citing *Dillon v. Nissan Motor Co.*, 986 F.2d 263, 267-68 (8th Cir. 1993)). They contend that the court should infer from the actions of the plaintiff's attorney the intent to suppress the truth because "[a]t the time of the sale of the Seaman wreckage, litigation was reasonably anticipated and, consequently, it was known or should have been known that the Seaman wreckage would be critical evidence as to the dynamic movements and interactions of the vehicles and their speed." *Id.* at 13-14; *see Doctor John's, Inc. v. City of Sioux City*, 486 F. Supp. 2d 953, 954 (N.D. Iowa 2007) ("A first year law student should have–and most would have–known that a party must retain [evidence] that [is] likely to be relevant in pending litigation.")

The plaintiff counters by asserting that it had no intent to destroy evidence for the purpose of obstructing or suppressing the truth. Doc. No. 22-1 at 7. They point out that at first Western National only requested to be provided enough time to hire an independent appraiser to take photographs. *Id.* at 5; Doc. No. 22-2 at 51. Western National's appraiser examined the Seaman vehicle on March 2, 2010 (Doc. No. 22-1 at 5; Doc. No. 22-2 at 42), so, the plaintiff argues, Western National "was provided exactly what it requested." The plaintiff asserts that it had no "duty to subsidize Defendants' procrastination." Doc. No. 22-1 at 6. The plaintiff further asserts that the defendants have not shown that they have been prejudiced by the destruction of the vehicle. *Id.* at 9.

"District courts have the inherent power to fashion an appropriate sanction for conduct which abuses the judicial process." *Gallagher v. Magner*, 619 F.3d 823, 844 (8th Cir. 2010) (quoting *Chambers v. PASCO, Inc.*, 501 U.S. 32, 44-45, 111 S. Ct. 2123, 2132-33 (1991)) (internal quotation marks omitted), *petition for cert. filed*, 79 U.S.L.W. 3494 (U.S. Feb. 14, 2011) (No. 10-1032). Spoliation of evidence can constitute such an abuse. *See Dillon*, 986 F.2d at 267. Before sanctions can be imposed for spoliation of

7

evidence, the party requesting the sanction must make a showing of prejudice. *Rattray v. Woodbury County, Iowa*, 761 F. Supp. 2d 836, 845 (N.D. Iowa 2010) (citing *Stevenson v. Union Pac. R.R. Co.*, 354 F.3d 739, 748 (8th Cir. 2004)).

In *Lewy v. Remington Arms Co.*, 836 F.2d 1104 (8th Cir. 1988), the Eighth Circuit Court of Appeals addressed the alleged spoliation of evidence in connection with the prelitigation destruction of documents pursuant to a routine document retention policy. After determining that the record was insufficient to decide whether the district court had erred by giving an adverse inference instruction as a spoliation sanction, the court set forth the following guidelines for the court to consider on remand: (1) whether the record retention policy was reasonable considering the facts and circumstances surrounding those documents, (2) whether lawsuits or complaints had been filed frequently concerning the type of records at issue, and (3) whether the document retention policy was instituted in bad faith. *Id*. at 1112. By way of example, and as dicta,[3] the court stated that, if a corporation "knew or should have known that the documents would become material at some point in the future then such documents should have been preserved."

In *Dillon*, the court was presented with a situation much like the present one. The plaintiff was a passenger in a vehicle manufactured by the defendant, and was seriously injured in a collision. He retained an attorney, who arranged for the vehicle to be sent to an expert. The expert inspected and photographed the vehicle. Later, the local police requested that the vehicle be removed from the expert's parking lot, so the expert had the vehicle towed to a salvage yard. The plaintiff's attorney was notified of this, but did nothing. Two weeks later, the vehicle was destroyed. The plaintiff then filed suit against the defendant-manufacturer.

The defendant filed a motion to dismiss or exclude all evidence and testimony from the expert, alleging spoliation of evidence. The district court found that, although the

---

[3]*See Stevenson*, 354 F.3d at 746 (declaring this language to be dicta).

plaintiff and the expert had destroyed crucial evidence, they had not acted in bad faith. Nevertheless, after finding that the defendant was prejudiced by the inability to inspect and perform tests on the damaged vehicle, the court excluded the testimony of the expert from the trial. The court also instructed the jury that it could infer that the destroyed evidence would have been unfavorable to the plaintiff. The jury returned a verdict for the defendant.

On appeal, the plaintiff argued that the district court erred in excluding his expert without a finding that the plaintiff's attorney or the expert had destroyed the vehicle in bad faith. The Eighth Circuit noted that a court may assess attorneys' fees only when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons, and that a court may dismiss a case as a sanction only upon a finding of bad faith, willfulness, or fault. *Dillon*, 986 F.2d at 266. However, the court pointed out that the case did not involve either the assessment of attorneys' fees or the dismissal of the case, but concerned the exclusion of evidence. The court observed that the "bad faith" requirement does not extend "to every possible disciplinary exercise of the court's inherent power, especially because such an extension would apply the requirement to even the most routine exercises of inherent power." *Id.* at 267 (quoting *Harlan v. Lewis*, 982 F.2d 1255, 1260 (8th Cir. 1993)); *see Chambers*, 501 U.S. at 42-46, 111 S. Ct. at 2131-33 (discussing the inherent powers of federal courts). The court found that in some circumstances it is sufficient for a court to base an order excluding expert evidence based on a finding that a party or its representative "knew or should have known" that an important piece of evidence should have been preserved but was not. *Dillon*, 986 F.2d at 267.

In *Stevenson*, one of the plaintiffs was killed in a car-train grade crossing accident. Before suit was filed, the defendant railroad destroyed a voice tape of conversations between the train crew and dispatch at the time of the accident and track maintenance records from before the accident. The plaintiffs moved for spoliation sanctions. The

9

railroad argued that sanctions were not justified because it destroyed the evidence in good faith pursuant to its routine document retention policies. The district court granted the motion for sanctions and instructed the jury that it could "assume that the contents of the voice tape and track inspection records would have been adverse, or detrimental, to the defendant." *Stevenson*, 354 F.3d at 743, 746.

On appeal, the Eighth Circuit considered the extent to which bad faith is necessary with regard to different types of sanctions (*id*. at 745), and clarified its holding in *Lewy*, as follows:

> [W]hile in dicta [in *Lewy*] we articulated a "knew or should have known" negligence standard, such a standard, standing alone, would be inconsistent with the bad faith consideration and the intentional destruction required to impose an adverse inference for the prelitigation destruction of documents. We have never approved of giving an adverse inference instruction on the basis of prelitigation destruction of evidence through a routine document retention policy on the basis of negligence alone. Where a routine document retention policy has been followed in this context, we now clarify that there must be some indication of an intent to destroy the evidence for the purpose of obstructing or suppressing the truth in order to impose the sanction of an adverse inference instruction.

*Id*. at 746-47 (footnote omitted) (citing *Lewy*, 836 F.2d at 1112). The court rejected a "knew or should have known" negligence standard for the giving of an adverse inference instruction in such situations, and held that "there must be a finding of intentional destruction indicating a desire to suppress the truth" before such a sanction is justified. *Id*. at 746. The court distinguished the holding in *Dillon*, in which the court appeared to approve the giving of an adverse inference instruction based on a "knew or should have known" standard, as being the product of a plain error review of a ruling by the district court. *Id*. at 747 n.2.

In *Morris v. Union Pacific Railroad*, 373 F.3d 896, 901 (8th Cir. 2004), the plaintiff was injured in a railroad accident. The defendant railroad routinely taped communications between its train crews and the railroad's dispatcher and then recycled the tapes after 90 days. *Id*. at 899. When the plaintiff filed suit, the recording that would have contained communications between the train crew and the railroad dispatcher before and after the plaintiff's injury had long since been destroyed. *Id*. at 899-900. The plaintiff moved for sanctions, arguing that the railroad should not have destroyed the recording. The district court found that the railroad had not intentionally destroyed the tape and that the railroad's tape-recycling policy was reasonable on its face. Nevertheless, relying on *Lewy*, 836 F.2d at 1112, the court held that, where evidence is destroyed pursuant to a valid document retention policy, a finding of no intent is not dispositive of the issue. The court concluded that destruction of the audiotape constituted "bad faith" because Union Pacific was "on notice" that litigation was likely to ensue after the Morris accident. As a result, the district court gave the jury an adverse inference instruction. The Eighth Circuit Court of Appeals reversed, holding that "there must be a finding of intentional destruction indicating a desire to suppress the truth" before an adverse inference instruction can be given. *Morris*, 373 F.3d at 901 (quoting *Stevenson*, 354 F.3d at 746). The court concluded that the district court's finding of "bad faith" was premised erroneously on the "knew or should have known" standard suggested by *Lewy* but rejected by *Stevenson*. *Id.* at 902.

In *Greyhound Lines, Inc. v. Wade*, 485 F.3d 1032 (8th Cir. 2007), the defendant's truck rear ended a Greyhound bus. Ten days later, Greyhound removed the bus's ECM, retrieved the information stored on it, and had the ECM erased. Greyhound then brought suit for damages. The defendants filed a motion asking for spoliation sanctions, arguing that they were prejudiced by not being able to conduct their own examination of the ECM.

11

*Id.* at 1035. The district court denied the motion. On appeal, the Eighth Circuit Court of Appeals affirmed, stating the following:

> A spoliation-of-evidence sanction requires "a finding of intentional destruction indicating a desire to suppress the truth." *Stevenson*, 354 F.3d at 746; *see Richter v. City of Omaha*, 273 Neb. 281, 729 N.W.2d 67, 71-73 (2007) (unfavorable inference where "spoliation or destruction was intentional and indicates fraud and a desire to suppress the truth").

*Greyhound*, 485 F.3d at 1035. The defendants argued that, because litigation was likely from the outset, Greyhound had a duty to preserve the ECM data. The court disagreed, stating, "The ultimate focus for imposing sanctions for spoliation of evidence is the intentional destruction of evidence indicating a desire to suppress the truth, not the prospect of litigation." *Id.* (citing *Morris*, 373 F.3d at 901). The court held that the district court did not err in finding no spoliation had occurred because the district court had specifically found that there was no showing the defendant destroyed the evidence out of a desire to suppress the truth. Notably, the court applied these principles to spoliation sanctions generally, and not just to the giving of an adverse inference instruction. *Accord Bakhtiari v. Lutz*, 507 F.3d 1132, 1135 (8th Cir. 2007) ("A spoliation sanction requires a finding that a party intentionally destroyed evidence with a desire to suppress the truth." (citing *Greyhound*, 485 F.3d at 1035)).

Thus, since *Lewy*, the standards in the Eighth Circuit Court of Appeals for determining whether various spoliation sanctions are appropriate have changed. In *Lewy*, the court approved the imposition of spoliation sanctions, including the giving of an adverse inference instruction, against a party who knew or should have known that documents would become material at some point in the future but nevertheless destroyed them. In *Dillon*, the court found the exclusion of expert evidence was an appropriate sanction for spoliation when the attorney for the party responsible for the spoliation "knew

12

or should have known" that important evidence should be preserved but nevertheless allowed it to be destroyed. In *Stevenson*, the court clarified that the "knew or should have known" standard does not justify the giving of an adverse inference instruction and that, before such an instruction can be given, the court must find that the evidence was intentionally destroyed out of a desire to suppress the truth. In *Morris*, the court restated its holding in *Stevenson* and held that a finding of "bad faith" is erroneous if it is based only on a "knew or should have known" standard. Bad faith requires a finding of intentional destruction of evidence "indicating a desire to suppress the truth."[4] In *Greyhound*, the court apparently held that all spoliation sanctions, not just the dismissal of a case or the giving of an adverse inference instruction, require that the court first find that evidence was destroyed intentionally and with a desire to suppress the truth.

Applying these legal principles to the present case, for the court to impose spoliation sanctions, it must find (1) that the plaintiff's attorney intentionally allowed the Seaman vehicle to be destroyed and (2) that the attorney acted out of a desire to suppress the truth. "Intent rarely is proved by direct evidence, and a district court has substantial leeway to determine intent through consideration of circumstantial evidence, witness credibility, motives of the witnesses in a particular case, and other factors." *Morris*, 373 F.3d at 901. The evidence here, both direct and circumstantial, is sufficient to prove both that the plaintiff intentionally allowed the Seaman vehicle to be destroyed and that he did so out

---

[4] As Judge Bennett stated in *Rattray*:

> The Eighth Circuit Court of Appeals has made clear that a sanction for destruction of evidence, such as an adverse inference instruction, requires a finding of intentional destruction indicating a desire to suppress the truth, *i.e.*, bad faith. *Menz v. New Holland North Am., Inc.*, 440 F.3d 1002, 1006 (8th Cir. 2006) (citing *Stevenson v. Union Pac. R.R. Co.*, 354 F.3d 739, 746 ( 8th Cir. 2004), and *Morris v. Union Pac. R.R.*, 373 F.3d 896, 901 (8th Cir. 2004)).

*Rattray*, 761 F. Supp. 2d at 845.

of a desire to suppress the truth, or at least out of a desire to give the defendants an opportunity to discover a version of the truth different from the one developed by his expert.

There is no question that the plaintiff's attorney intentionally allowed the vehicle to be destroyed. He knew the vehicle was likely to be scrapped when he negotiated the transfer of the vehicle to the towing company to satisfy the company's storage claim. While he was making these arrangements, he was in continuous contact with representatives of the defendants, but curiously remained silent about his plans. Then, he did not waste his time – he completed the transfer of the vehicle's title, which facilitated its destruction, just 53 days after the accident. This was an unreasonably short amount of time for him to decide that evidence crucial to the reconstruction of the accident should be destroyed without any notice to other interested parties.

The evidence also established that the plaintiff's attorney allowed the vehicle to be destroyed with the intent to deprive the other interested parties of the opportunity to have their experts examine the vehicle. The only reason to have done this was to suppress the truth. The plaintiff's attorney obviously knew when he first was retained in the matter that an inspection of the involved vehicles would be crucial to a reconstruction of the accident because a week after the accident, he contacted the representatives of the defendants to make sure that the condition of the semi would not be altered. Then, as soon as his expert had completed his examination of both vehicles, he arranged for the Seaman vehicle to be destroyed. The only reason to have done this was to deprive the defendants' experts of the opportunity to conduct their own inspection of the vehicle.

Any intimation that the vehicle was sold because of mounting storage charges would be disingenuous. The storage claim was *de minimis* compared to damages the plaintiff eventually would claim in this lawsuit. In any event, the towing company released its claim for storage fees in exchange for title to the vehicle, so the plaintiff ended up having

the vehicle stored at no cost. The plaintiff's attorney had several opportunities to advise the defendants' representatives of his intention to scrap the vehicle. He knew that, in response to such information, they would either have expedited their experts' inspection of the vehicle or assumed responsibility for the storage costs. Although even a first-year law student would have known that this was the right thing to do, as soon as his expert completed his own examination of the vehicle, he arranged for the transfer of the title to the vehicle to the towing company without telling anyone. The court finds that these facts establish that the plaintiff destroyed the vehicle out of a desire to suppress the truth.

For the court to impose spoliation sanctions, the defendants also must show they have been prejudiced by the destruction of the evidence. As in *Rattray*, the "prejudice" requirement is satisfied here "by the nature of the evidence destroyed." *Rattray*, 761 F. Supp. 2d at 847 (quoting *Stevenson*, 354 F.3d at 748). Even if the missing vehicle cannot be shown to have been "a smoking gun," the very fact that an examination of the vehicle is necessary to calculate the impact speeds of the vehicles involved in the collision is sufficient to show prejudice. *See id.*

The court now must determine the appropriate spoliation sanctions under the circumstances of this case. The court finds that neither the dismissal of the case nor the giving of an adverse inference instruction would be appropriate. These sanctions would be more severe than necessary to level the playing field.

The chief advantage to the plaintiff from the destruction of the Seaman vehicle is that the plaintiff has an expert who can testify about what he observed from his examination of both the semi and the Seaman vehicle, and the defendants' experts can be challenged with the fact that they did not examine the Seaman vehicle. In these circumstances, the court finds it appropriate and sufficient to strike Peterson's testimony and his report from evidence. The plaintiff may not call Peterson as a witness at trial, nor may it present to the jury any testimony, deposition, document, or report relating to

Peterson, his report, his work product, or to his opinions. The plaintiff may, however, designate another expert to testify on its behalf, in lieu of Peterson. For this purpose, the expert witness designation deadline is continued to November 17, 2011, and the deadline for designating rebuttal expert testimony is continued to December 20, 2011. Discovery is reopened until January 15, 2012, but only for the purpose of conducting discovery relating to these expert designations. To further clarify this ruling, the parties and their experts are permitted to use Peterson's measurements and photographs in reaching their own opinions, but may not make any reference to Peterson's testimony, report, work product, or opinions.

## CONCLUSION

For the reasons stated above, the defendants' motion for sanctions (Doc. No. 19) is **granted**. The expert witness designation deadline is continued to November 17, 2011; the deadline for designating rebuttal expert testimony is continued to December 20, 2011; and discovery is reopened until January 15, 2012, but only for the purpose of conducting discovery relating to these expert designations.

**IT IS SO ORDERED.**

**DATED** this 17th day of October, 2011.

PAUL A. ZOSS
CHIEF MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT